**UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 DEC 16  AM 11: 29

CLERK

BY _____
DEPUTY CLERK

RACHAEL WYATT                                 :
    Plaintiff,                                 :
                                               :
    v.                                         :    CAUSE NO. 2: 11-CV-297
                                               :
CITY OF BARRE\BARRE CITY FIRE   :
DEPARTMENT,                                    :    **JURY TRIAL DEMANDED**
TIMOTHY BOMBARDIER,                  :
JOE ALDSWORTH, ROBERT            :
HOWARTH and CINDY HOWARTH,  :
    Defendants.                                :

## COMPLAINT

    Plaintiff, Rachael Wyatt, hereby complains against the above-named defendants as follows:

### I.   **Overview: Parties & Jurisdiction**

1.  This action arises under and invokes the jurisdiction of this Court pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*, 42 U.S.C. §§ 1983 and 1985, the First, Fifth and Fourteenth Amendments of the United States Constitution, and 28 U.S.C. § 1331.

2.  Claims are also stated under the laws of the State of Vermont, and this Court's supplemental jurisdiction is invoked under 28 U.S.C. §1367.

3.  Plaintiff, Rachael Wyatt, is a resident of the City of Barre, County of Washington, State of Vermont.

4.  The Defendant Barre City Fire Department is a department of the City of Barre, a Vermont municipality, as established by municipal ordinance, Article VI, Division 4, Sec 2-82, *et seq.*

5. The Defendant Timothy Bombardier is the Chief of the Barre City Police and Fire Departments and upon information, knowledge and belief, a resident of Richmond, Vermont.

6. The Defendant Joe Aldsworth is the Deputy Chief of the Barre City Fire Department and upon information, knowledge and belief, a resident of Graniteville, Vermont.

7. The Defendant Robert Howarth is a Firefighter with the Barre City Fire Department with the rank of Captain and upon information, knowledge and belief, is a resident of Washington, Vermont.

8. The Defendant Cindy Howarth is a Call Force Firefighter with the Barre City Fire Department and upon information, knowledge and belief, is a resident of Washington, Vermont.

9. Venue is appropriate in this district under 28 U.S.C. §1391 (b) because the Plaintiff resides here, and a substantial part of the events giving rise to the Complaint occurred here.

II. **Nature of the Action and Relief Sought**

10. Plaintiff, a female member of the Barre City Fire Department's Call Force from March 25, 2009 until September 8, 2010 is the victim of unlawful workplace discrimination by the defendants.

11. Plaintiff was first subjected to a hostile work environment, based upon her sex, and was then retaliated against and suffered adverse employment action because she opposed and reported the harassment.

12. Plaintiff was then subjected to *quid pro quo* sexual harassment by her direct supervisor, and was further retaliated against because she refused his sexual advances and because she opposed and reported the harassment.

13. Plaintiff's employment was terminated without just cause.

14. Defendants' stated reason for the termination was a pretext for unlawful retaliation, in violation of federal and state discrimination laws.

15. Plaintiff was subjected to disparate treatment in the terms and conditions of her employment (and her termination) as compared to similarly situated male coworkers.

16. Plaintiff's termination was also unlawful retaliation for her First Amendment right to protected "whistleblower" speech.

17. Plaintiff's termination was also the unlawful taking of a protected property interest without due process.

18. Plaintiff seeks appropriate injunctive relief, compensatory and punitive damages, costs and attorney fees, and other appropriate relief.

**III.   Facts**

19. In the Fall of 2008, Plaintiff was enrolled in an Emergency Medical Technician ("EMT") course. Her course curriculum required ambulance "ride time," and she was sponsored by the Chief of the Barre City Fire Department (hereinafter "BCFD") to do her "ride-alongs" with the BCFD (a combined Fire and EMT Department). The Chief at that time was Peter John.

20. Although the EMT course curriculum mandated only 10 ride-along hours and 5 patient assessments (at EMT-Basic level), Plaintiff took full advantage of her "ride-along" apprenticeship with the BCFD, and regularly signed up for as many ride-alongs as her own schedule would permit.

21. At the beginning of her apprenticeship, Plaintiff usually signed up to do her ride-alongs with the Shift 2 Firefighters, which then included Lieutenant Keith Cushman, Firefighter/Paramedic Joe Aldsworth (who would later become Deputy

Chief of the Department), Firefighter/EMT-I Jeff Cochran and Firefighter/EMT-I Nick Copping.  These men supported and encouraged Plaintiff throughout her apprenticeship, and Joe Aldsworth, especially, assumed a mentor role.

22. In early 2009, a Call Force Firefighter position opened at the BCFD.  The Shift 2 firefighters encouraged Plaintiff to apply, and she did.  She easily passed the physical agility examination, and, on March 25, 2009, Plaintiff was hired as a BCFD Call Force Firefighter.

23. At the time of her hire, Plaintiff had completed her course, but had not obtained her EMT-B certification, which required she pass a written examination. Plaintiff is dyslexic and encountered substantial difficulty with the computer-generated written exam.

24. Upon information, knowledge and belief, the Standard Operating Guidelines and Department policy provided at the time of Plaintiff's hire that all Call Force Firefighters had eighteen (18) months from the date of hire to obtain their EMT-B Certification *or* their Firefighter-1 Certification.

25. Plaintiff was assured at the time of her hire that she would have eighteen (18) months to obtain her EMT-B Certification.

26. As a Call Force Firefighter, Plaintiff was issued a pager which transmitted several distinct tones, depending upon the nature of the emergency call.

27. Upon information, knowledge and belief, the Standard Operating Guidelines and Department policy at the time of Plaintiff's hire provided that a "first tone" was for full time Firefighters; a "second tone" was for *certified* Call Force members, and a third tone was for any Department employee available to respond.

28. BCFD policy was to encourage all Call Force members to respond to any emergency tone, regardless of certification.  If upon arrival the ambulance and/or

fire trucks had already departed the Station, responding Call Force Firefighters were expected to assist at the Station, to "cover" for the personnel that went out to respond.

29. Plaintiff regularly responded to emergency tones, regardless of the nature of the call, knowing that she, at a minimum, could lend her assistance by covering at the Station. Plaintiff was paid for her response time.

30. Plaintiff, like all Call Force Firefighters, also had the option of continuing the ride-alongs. As she had done prior to her hire, Plaintiff signed up for frequent ride-along shifts. This required Plaintiff to be present at the Station and to join in the response if a call came in. Unlike during her apprenticeship, though, Plaintiff was paid for her response time.

31. Department policy was to encourage Call Force Firefighters to continue the apprentice-like ride-alongs.

32. When Plaintiff signed up for a shift, the Department's "chain of command" rules dictated that the officer in charge was her direct superior.

33. On multiple occasions, Lieutenant Robert Howarth was Plaintiff's direct supervisor in his capacity as officer in charge. Lieutenant Howarth's wife, Cindy Howarth, was also a Call Force Firefighter.

34. The Howarths, individually and jointly, through their words and actions created an atmosphere in the Station that was severely and pervasively offensive, demeaning and hostile to the Plaintiff.

35. Upon information, knowledge and belief, the Howarths intended to create a hostile and offensive work environment, and their efforts were motivated by Plaintiff's gender and by their desire to force Plaintiff off of the Department, because she was a woman.

36. The Howarth's discriminatory intimidation and ridicule, included, but was not limited to:

a)  Referring to Plaintiff as the "dumb blonde";

b)  Vocalizing opinions to the effect that Plaintiff was "just playing firefighter to find a husband";

c)  Publicly posting comments to the effect that "everyone knows she [the plaintiff] is here to find a husband" and that the Plaintiff is "not fooling anyone";

d)  Publicly commenting upon Plaintiff's body and her mannerisms, including questioning (in Plaintiff's presence) how the Plaintiff was able to "shake her ass like that" while carrying a forty pound fire hose;

e)  Publicly commenting upon Plaintiff's attire;

f)  Publicly commenting upon Plaintiff's scent;

g)  Seeking out details of Plaintiff's personal life and sharing those details with other colleagues;

h)  Making and spreading false accusations of Plaintiff being intimate with several other male firefighters; and,

i)  Suggesting to the wives of other Firefighters that they should be concerned about Plaintiff's intentions within the Department.

37. Cindy Howarth frequently stared at Plaintiff in an intimidating and uncomfortable fashion, seemingly fixated on Plaintiff's every move, with the intent and effect of causing Plaintiff substantial discomfort and intimidation.

38. Upon information, knowledge and belief, Cindy Howarth was also responsible for hiding and/or disposing of Plaintiff's time sheets, her lunch, and on at least one occasion, her Department-issued firefighting gear.

39. Lieutenant Howarth refused to interact with Plaintiff altogether.  If Plaintiff greeted him with a "hello," he ignored her; if she sat at the lunch table, he would leave.

40. Upon information, knowledge and belief, the Howarths had previously treated another female firefighter in a similarly offensive and degrading and hostile manner, and that firefighter had resigned from her position at the Department as a result.

41. It was very clear to Plaintiff that the Howarths were similarly motivated and that their treatment of her was intended and designed to force her out of the Department as well.

42. Plaintiff frequently complained about the Howarths' harassment to Chief Timothy Bombardier, who had replaced Chief Peter John.

43. At all relevant times, Chief Bombardier served in a dual capacity as Chief of the Barre City Police and Fire Department.  Upon information, knowledge and belief, no one person had previously served in both capacities for the City of Barre before.

44. Upon information, knowledge and belief, Chief Bombardier had personal knowledge of the Howarths' prior and similar treatment of a female firefighter.

45. Chief Bombardier acknowledged to Plaintiff that he believed the Howarths' conduct was motivated by Plaintiff's gender and he repeatedly promised that he would instruct the Howarths to cease and desist from their harassment.

46. Plaintiff does not know whether Chief Bombardier ever spoke with either Howarths regarding Plaintiff's complaints, but if he did make an effort to stop the harassment, his effort was unsuccessful.

47. After Plaintiff complained to Chief Bombardier about the Howarths' misconduct, the misconduct escalated, and Robert Howarth abused his role as Plaintiff's supervisor to subject Plaintiff to adverse employment action, as retaliation for her reports of harassment against him and his wife.

48. On one occasion, Cindy Howarth made a false report that the Plaintiff had engaged in inappropriate contact with a male (and married) Firefighter during a training exercise.  The Complaint was investigated and proven to be false. However, Plaintiff was questioned, as was her male colleague, and the incident was degrading and humiliating for the Plaintiff.

49. On other occasions, Cindy Howarth publicly posted her views of the Plaintiff's role at the BCFD on Facebook, the social networking site used by the Plaintiff and many of her colleagues.   The posts were of similar gist to those opinions Cindy Howarth repeatedly expressed at the Station concerning Plaintiff's supposed intentions, as well as Ms. Howarth's assertion that "woman like her give us real, women firefighters a bad name".

50. On another occasion, Lieutenant Howarth ordered Plaintiff to go home when she arrived for her shift at the Station, telling her (in the presence of other colleagues) that her perfume was too strong and she would not be allowed to work his shift that evening until she first went home and showered.

51. Plaintiff had complained of the Howarths' harassment on several occasions, but following the "perfume" incident, she enlisted the help of her mentor Joe Aldsworth who supported Plaintiff and had personally witnessed the Howarths' offensive and degrading treatment.  By this time, Aldsworth had been promoted and was serving as the Department's Deputy Chief.

52. Following Plaintiff's meeting with Deputy Chief Aldsworth and Chief Bombardier, the Chief indicated that he was bringing mediators in to the Station in an effort to resolve the continuing problem. A mediator did visit the station on one occasion, and provided Plaintiff and other Department employees questionnaires to complete.

53. Plaintiff heard nothing regarding the mediator again. Meanwhile, she continued to be harassed and oppressed by the Howarths. On several occasions Plaintiff asked Chief Bombardier whether the mediator would return. Each time, Chief Bombardier indicated that he would call the mediator, but it is not known whether he ever did.

54. Upon information, knowledge and belief, Cindy Howarth was never reprimanded for her treatment of Plaintiff. Lieutenant Howarth was promoted to Department Captain.

55. Captain Howarth thereafter used his authority to retaliate against Plaintiff for reporting sexual harassment by him, his wife, and other members of the Department.

56. On one occasion, Captain Howarth ordered Plaintiff to return home when she responded to the Station for a call, telling her in front of other Department personnel that she was "useless".

57. On another occasion, Captain Howarth laughed mockingly to others when it was communicated to him that Plaintiff had arrived at the Station to provide coverage, and then refused to allow her to respond to the call.

58. On at least five (5) occasions, Howarth sent Plaintiff home without justification when she responded to an emergency call and he was the officer in charge, each

time depriving Plaintiff of the pay she otherwise would have made had she been allowed to respond.

59. Plaintiff continued with her complaints to Chief Bombardier, whose response was to send out a Department Memorandum advising all employees to "follow chain of command" when making future complaints.  Specifically, all complaints were to be made to the "direct supervisor" whose responsibility would then be to determine whether to take the complaint to the Chief.

60. Since Plaintiff's direct supervisor was himself a serial perpetrator of sexual discrimination, harassment and retaliation against Plaintiff and at least one other female firefighter, Plaintiff reasonably interpreted this directive from the Chief as a powerful message that Defendants did not intend to investigate her complaints or to take any action to protect her against continued discrimination, harassment and retaliation.

61. Plaintiff's suspicions were soon thereafter confirmed when Chief Bombardier told her that he was tired of her "causing him headaches," and his subsequent treatment of the Plaintiff was consistent with one making an effort to rid himself of a perceived headache, rather than to fulfill his legal obligations to protect Plaintiff.

62. In February of 2010, Plaintiff had seven more months within which to pass the examination to receive her EMT-B certification, pursuant to Department policy. Despite that, in a meeting with Plaintiff on February 23, 2010, Chief Bombardier suspended the Plaintiff, telling her that she was not allowed to respond to calls nor allowed to sign up for ride-alongs until she received her EMT-B certification.  At the same meeting, Chief Bombardier told Plaintiff that she was an "at will"

employee and that he could fire her at any time, and that he was giving her just one last chance to "prove herself".

63. Upon information, knowledge and belief, at the time of Plaintiff's suspension, there were other Call Force Fighters without EMT-B certifications, none of whom were suspended pending certification.

64. Upon information, knowledge and belief, the eighteen (18) month period during which a Call Force Firefighter had to obtain certification had not been similarly limited for any other Department employee.

65. Upon information, knowledge and belief, several of Plaintiff's male counterparts, both in the past and contemporaneously, had struggled with the written examination, and none were told that they had one final time to pass the examination to prove themselves, or they would be terminated.

66. During her suspension, which lasted more than three (3) months, Plaintiff was deprived the income she otherwise would have had, had she been allowed to respond to calls or sign up for shift ride-alongs.

67. The day after Plaintiff's suspension, Chief Bombardier directed Captain Keith Cushman to send an email message to all Department Captains and Lieutenants, including Captain Howarth, advising that Plaintiff was no longer permitted at the Station other than to use the classroom to study. The memo dictated that Plaintiff could use the restroom if she had to, but that she would not be permitted elsewhere in the building. Plaintiff was not copied on the Memorandum, and did not know that part of her suspension meant she could only use one room and the bathroom at the station.

68. The memorandum had the impact of making Plaintiff an object of ridicule among her colleagues, which contributed to the intimidating and offensive work environment.

69. Following issuance of the Memorandum and during her suspension, Plaintiff arrived at the station on one occasion to study, but the classroom was occupied. Plaintiff went to the dispatch room to wait, where she was encountered by Captain Howarth and his wife.  Captain Howarth immediately barked at the Plaintiff that she wasn't "allowed" at the Station, and ordered her to leave.

70. Upon information, knowledge and belief, the demeaning nature of the suspension and its isolating effect was in retaliation for Plaintiff's complaints of unlawful sexual harassment.

71. Deputy Chief Aldsworth, who had mentored and supported Plaintiff since her apprenticeship, was aware of Plaintiff's job vulnerability and volunteered to assist her.

72. Deputy Chief Aldsworth did, in fact, meet with Plaintiff and help her prepare for the examination.   While doing so, however, he began to make unwelcome comments of a sexual and suggestive nature, including but not limited to:

    a.  "I saw you today.  You are looking hot in those jeans."

    b.  "Nick says you give amazing blow jobs.  Care to let me be the judge of that."

    c.  "I'm jealous.  Nick has a pic of your breast.  I want one. I won't show anyone."

    d.  "You Need a man who can appreciate a woman's body such as yours."

    e.  "I love my wife but she can't handle the size of my cock. I need a woman who can.  Interested?"

73. Deputy Chief Aldsworth bragged to Plaintiff about the size of his penis, informing her that he was very sexual and believed in "playing around," and thought that she'd understand.  On multiple occasions, Aldsworth contacted Plaintiff to tell her that his wife was not home, and asked her to come to his home for sex.

74. Aldsworth's sexual advances were not welcome and were not encouraged.

75. Plaintiff endured the harassment for longer than she should because she was intimidated and afraid to complain for fear of retaliation, and the loss of her job.

76. However, after Plaintiff repeatedly rebuked Deputy Chief Aldsworth's sexual advances, Aldsworth "suggested" that Plaintiff consider looking for a job in another Department.

77. Plaintiff reasonably interpreted this to mean that her employment with the BCFD was now in even further jeopardy because of her rejection of Aldsworth's advances.

78. On May 6, 2010, Plaintiff reported Deputy Chief Aldsworth's sexual harassment to Chief Bombardier.  Although Aldsworth admitted to sending the sexually charged messages, he was not reprimanded.  Moreover, Chief Bombardier told another male Firefighter that he believed Plaintiff had welcomed and/or encouraged the sexually charged messages, which was not true.

79. After Plaintiff reported the sexual harassment, Chief Bombardier revoked her suspension and she was allowed to return to the Station.

80. However, upon her approved return to the Station, Deputy Chief Aldsworth immediately informed her that she still would not be able to respond to emergency calls (or earn any income) until she first completed forty hours of field training.

81. Upon information, knowledge and belief, Plaintiff had completed the same amount, or more, of required field training compared to her similarly situated male coworkers, and no other employee was subject to similar restrictions.

82. Then, after Plaintiff completed the field training, Deputy Aldsworth told her she would remain on restricted duty until she completed an Emergency Vehicle Operator training, despite that she had already been trained and frequently drove those vehicles as part of her regular duties.

83. Upon information, knowledge and belief, no similar restriction was imposed upon Plaintiff's male coworkers pending their own completion of that training.

84. In July of 2010, a memorandum was circulated in the Department soliciting the Department's female personnel to volunteer for a program called "Rosie's Girls". According to the memorandum, the program was designed to teach young girls that "women have a place in fire service" and other male-dominated professions.

85. All interested personnel were directed to contact Deputy Chief Aldsworth, and Plaintiff readily offered her services.

86. Deputy Chief Aldsworth refused to allow Plaintiff to participate in the event, without justification, and that decision was expressly endorsed by Chief Bombardier.

87. Deputy Chief Aldsworth subjected Plaintiff to these adverse employment actions because Plaintiff refused his sexual advances and in retaliation for her reporting his sexual harassment.

88. Captain Howarth, too, continued in his efforts to deprive Plaintiff a livelihood at the Department.  Following Plaintiff receiving her EMT-B certification, and eligibility to respond to "two tone" emergency calls, Captain Howarth refused to

allow her to respond, claiming now that she was ineligible because she was not *dual* certified, *i.e.*, she did not have both an EMT-B *and* an FF-1 certification.

89. Upon information, knowledge and belief, at no time did the Department's Standard Operating Guidelines restrict a Call Force Firefighters ability to respond to calls to their certification status.

90. Upon information, knowledge and belief, other Call Force Firefighters, Cindy Howarth included, were not deprived of response time due to a lack of dual certification.

91. By the Summer of 2010, Plaintiff had been compelled to endure a hostile work environment based upon her sex, had been subjected to *quid pro quo* sexual harassment, and had been retaliated against for reporting both.  None of the perpetrators had been reprimanded; Chief Bombardier publicly doubted that Aldsworth's sexual advances were unwelcomed by Plaintiff; and, Plaintiff herself was suspended in humiliating and demeaning fashion and was then subjected to an ever-expanding list of arbitrary requirements that were not applied equally to male firefighters.

92. The events had a trickle down effect in empowering other of Plaintiff's colleagues to deny Plaintiff basic workplace respect.  For example, on one occasion a male colleague refused Plaintiff entry into the locked EMS room, telling her: "I don't give a fuck who you are.  I am not going to kiss your ass".

93. In July of 2010, Plaintiff made an anonymous call to the State's Emergency Medical Services expressing concern about an EMT-I colleague's fitness for duty. Plaintiff had witnessed the EMT-I break down emotionally at a response scene rendering her unable to assist in the response, and Plaintiff was aware that the individual had recently been hospitalized following a suicide attempt.

Furthermore, the individual's daughter had reached out to the Plaintiff to express concern of her own regarding her mother's mental state.

94. Plaintiff made this call because she was concerned about the welfare of the colleague, and also because she was concerned that the colleague's impairment created a risk to public safety and created an unsafe working environment for other first-responders, including Plaintiff.

95. For reasons not completely understood, the fact of the call was made known to Chief Bombardier. On August 31, 2010, Plaintiff was summoned to Chief Bombardier's office, who asked whether she had made the call.  Present in the office already was Deputy Chief Aldsworth.

96. Plaintiff who had made the call anonymously because she *didn't* want her identity known, denied making the call.  In response to that denial, she was again suspended pending "investigation".

97. Upon information, knowledge and belief, the "investigation" involved Chief Bombardier obtaining a copy of the recorded call, and then inviting four other male Firefighters (including Aldsworth) to listen to the recording, for the purpose of identifying Plaintiff's voice.

98. Having satisfied himself that Plaintiff was the anonymous caller, Chief Bombardier then fired the Plaintiff for "lying," and accused her of defaming the EMT-I at issue.

99. The stated reason for Plaintiff's termination was a pretext.  Plaintiff was terminated in  retaliation for opposing and reporting sexual harassment in the workplace.

100. Upon information and belief, Chief Bombardier did not terminate Plaintiff's male coworkers who committed substantially worse infractions, including

possession of alcohol by a minor in one case, use of an emergency vehicle without authorization in another, and use of an emergency vehicle for sexual relations in yet another.

101. On September 19, 2011, following an investigation, the U.S. Department of Justice, Civil Rights Division granted Plaintiff a Notice of Right to Sue.

**COUNT ONE:     UNLAWFUL SEX DISCRIMINATION IN VIOLATION OF TITLE VII, 42 U.S.C. §2000e *et seq.***

102. The foregoing paragraphs are hereby incorporated by reference.

103. Plaintiff was discriminated against in the workplace because of her sex.

104. The Defendants' unlawful conduct, individually and combined, was severe and pervasive, and had the intent and effect of creating a hostile work environment, because of Plaintiff's sex.

105. Plaintiff was denied economic benefit because of her gender and because she rejected the sexual advances of a supervisor.

106. Plaintiff was subjected to adverse employment action because she complained of sexual harassment in the workplace.

107. Plaintiff was terminated in retaliation for opposing and reporting sexual harassment in the workplace.

108. The reason given by Defendant for Plaintiff's termination was a pretext for unlawful discrimination.

109. Plaintiff was arbitrarily and unreasonably held to higher standards than her similarly situated male coworkers.

110. As a result of defendants' unlawful discrimination, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

111. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.

**COUNT TWO:        BREACH OF CONTRACT**

112. The foregoing paragraphs are incorporated by reference.

113. The terms and conditions of Plaintiff's employment are outlined in the City of Barre's Municipal Ordinance, the latter of which sets forth the process and procedure due for the suspension and/or termination of any member of the Barre City Fire Department.

114. Plaintiff had a reasonable expectation that her job would not be in jeopardy for lacking an EMT-B certification for the first eighteen (18) months of employment, and that she was entitled to due process, including a Hearing and a finding of cause, prior to being terminated.

115. The Municipal Ordinance and/or the Department's Standard Operating Guidelines modified Plaintiff's "at will" status to create an implied contract containing terms including, but not limited, to a requirement that cause and process were required to support Plaintiff's termination.

116. The Defendants terminated Plaintiff without cause and without providing any process, in breach of the parties' implied contract.

117. Defendants breached the implied covenant of good faith and fair dealing.

118. As a result of Defendants' breach of contract, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

119. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.

**COUNT THREE:   WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**

120. The foregoing paragraphs are incorporated by reference.

121. Plaintiff's objections, complaints and reports, described above, were legally protected activities.

122. Plaintiff was unlawfully terminated because of her legally protected activities.

123. Defendants' termination of plaintiff's employment was a violation of the public policy of the State of Vermont.

124. As a result of Defendants' wrongful termination, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

125. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.

**COUNT FOUR:   VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FIRST AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**

126. The foregoing paragraphs are incorporated by reference.

127. Plaintiff made an anonymous report of public concern relating to the fitness of an emergency responder to safely perform the essential functions and duties of her job, creating a risk to herself, her coworkers, and the public.

128. Plaintiff's right to make the anonymous report is guaranteed and protected by the First Amendment to the United States Constitution.

129. The employment of female firefighters without fear of unlawful discrimination is also a matter of public concern, as evidenced by the Defendant's own memorandum regarding the "Rosie's Girls" event, alleged above.

130. Plaintiff's right to petition the Chief BCFD to redress grievances regarding pervasive sexual discrimination in the BCFD was also guaranteed and protected by the First Amendment.

131. Defendants harassed Plaintiff and terminated her employment because she exercised her First Amendment rights.

132. Defendants' unlawful discrimination, harassment and retaliation against Plaintiff was not in furtherance of any legitimate governmental interest in the effective and efficient management of its internal affairs sufficient to deprive Plaintiff of rights guaranteed and protected by the First Amendment.

133. As a result of Defendants' unlawful and unconstitutional retaliation, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

134. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.

135. Plaintiff has a private cause of action under 42 U.S.C. §1983 to enforce her First Amendment right to engage in protected speech.

**COUNT FIVE:       VIOLATION   OF   PLAINTIFF'S   RIGHTS   UNDER CHAPTER   1,   ARTICLE   13   OF   THE   VERMONT CONSTITUTION**

136. The foregoing paragraphs are incorporated by reference.

137. Plaintiff made an anonymous report of public concern relating to the fitness of an emergency responder to perform the essential functions and duties of her job.

138. Plaintiff's right to make the anonymous report is guaranteed and protected by Chapter 1, Article 13 of the Vermont Constitution.

139. The employment of female firefighters without fear of unlawful discrimination is also a matter of public concern, as evidenced by the Defendant's own memorandum regarding the "Rosie's Girls" event, alleged above.

140. Plaintiff's right to petition the Chief BCFD to redress her grievances regarding sexual discrimination in the BCFD was also guaranteed and protected by Article 13.

141. Defendant's harassment of Plaintiff and termination of Plaintiff's employment was in retaliation for her exercising her constitutional right to free speech.

142. Plaintiff's termination was retaliation against her Article 13 Right to free speech.

143. Defendants' unlawful discrimination, harassment and retaliation against Plaintiff was not in furtherance of any legitimate governmental interest in the effective and efficient management of its internal affairs sufficient to deprive Plaintiff of rights guaranteed and protected by Article 13.

144. As a result of defendants' unlawful and unconstitutional retaliation, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

145. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.

**COUNT SIX:**       **VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511 *et seq.***

146. The foregoing paragraphs are incorporated by reference.

147. Plaintiff's anonymous phone call regarding the impaired EMT was a "wire communication" within the meaning of the Electronic Communications Privacy Act, 18 USC § 2510(1).

148. Defendants are "persons" within the meaning of the Electronic Communications Privacy Act, 18 USC § 2510(6).

149. One or more of the Defendants "intercepted" the contents of the wire communication through the use of electronic, mechanical or other devices, within the meaning of the Electronic Communications Privacy Act, 18 USC § 2510(4).

150. One or more of the Defendants:

    a. intentionally intercepted and/or procured another person to intercept Plaintiff's anonymous voicemail message regarding the impaired EMT, in violation of 18 USC §2511(1)(a).

    b. disclosed the contents of the voicemail message to others knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of 18 USC §2511(1)(c); and/or

    c. intentionally used, or endeavored to use, the contents of the voicemail message, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 USC §2511(a).

151. One or more of the Defendants were, at relevant times, "investigative or law enforcement officers" within the meaning of the Electronic Communications Privacy Act, 18 USC § 2510(7), and willfully disclosed and/or used information regarding the wire communication beyond the extent permitted by 18 USC § 2517.

152. Plaintiff is an "aggrieved person" within the meaning of the the Electronic Communications Privacy Act, 18 USC § 2510(11).

153. Pursuant to 18 USC § 2520, Plaintiff is entitled to maintain a civil action against the Defendants for their violations of the ECPA, and to obtain appropriate relief, including:

   **(1)** such preliminary and other equitable or declaratory relief as may be appropriate;

   **(2)** damages under subsection (c) and punitive damages; and

   **(3)** a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT SEVEN:          VIOLATION OF THE STORED COMMUNICATIONS PRIVACY ACT , 18 USC §2701 *et seq.***

154. The foregoing paragraphs are incorporated by reference.

155. Plaintiff's anonymous phone call regarding the impaired EMT was a "wire or electronic communication" within the meaning of the Stored Wire and Electronic Communications and Transactional Records Access Act, 18 USC § 2701.

156. The voicemail system utilized by Plaintiff to report her concerns regarding the

impaired EMT was an "electronic communications service" within the meaning of the Stored Wire and Electronic Communications and Transactional Records Access Act, 18 USC § 2701.

157. One or more of the Defendants intentionally accessed, without authorization, the facility through which said electronic communications service was provided and/or intentionally exceeded an authorization to access that facility, and thereby obtained access to plaintiff's anonymous phone call regarding the impaired EMT, in violation of the Stored Wire and Electronic Communications and Transactional Records Access Act, 18 USC § 2701(a).

158. The saved voicemail recording of Plaintiff's concerning the impaired EMT is a "record" of her voice within the meaning of 5 U.S.C. § 552a(a)(4).

159. Defendants' conduct in violation of the Stored Wire and Electronic Communications and Transactional Records Access Act, 18 USC § 2701et seq., was willful, wanton and outrageous.

160. Plaintiff is a "person aggrieved" by Defendant's willful violations of the Stored Wire and Electronic Communications and Transactional Records Access Act, 18 USC § 2701 *et seq.*, and is therefore entitled to maintain this civil action and to recover such relief as may be appropriate, including:

   (1) such preliminary and other equitable or declaratory relief as may be appropriate;

   (2) damages, including the actual damages suffered by Plaintiff in an amount not less than $1000.00, and punitive damages; and

   (3) a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT EIGHT:    TORTIOUS INVASION OF PRIVACY**

161. The foregoing paragraphs are incorporated by reference.

162. Plaintiff had the right to make an anonymous call.

163. Plaintiff had a reasonable expectation that her communication would remain anonymous and would only be used by the recipient for the purposes for which it was intended, to assist the impaired EMT and protect the public and the workplace for first responders, and that it would not be intercepted and/or obtained by the Defendants for the purpose of fabricating a pretextual reason for terminating her employment in retaliation for her engaging in legally-protected activities.

164. The Defendants intentionally interfered with the Plaintiff's right to privacy when they accessed the voicemail recording, and played the recording in the presence of Plaintiff's colleagues, including her harassers.

165. The Defendants' conduct was highly offensive and would be highly offensive to a reasonable person.

166. The Defendants' invasion of Plaintiff's privacy right was substantial.

167. As a result of defendants' tortious conduct, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

168. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.


**COUNT NINE:        VIOLATION OF PLAINTIFF'S RIGHT TO DUE PROCESS
UNDER THE FIFTH and FOURTEENTH AMENDMENTS**

169. The foregoing paragraphs are incorporated by reference.

170. As a public employee and member of the BCFD, according to local ordinance, Plaintiff had a legitimate claim to continued employment by the BCFD.

171. Plaintiff's entitlement to continued employment gave rise to a property interest within the meaning of the Fifth and Fourteenth Amendments of the United States Constitution that could not be taken without due process.

172. Plaintiff was afforded no process at the time of her termination.

173. Plaintiff's termination was in violation of her due process rights under the Constitution.

174. As a result of defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

175. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.

176. Plaintiff has a private cause of action under 42 U.S.C. §1983 to enforce her constitutional right to procedural due process of the laws

**COUNT TEN:**      **VIOLATION OF PLAINTIFF'S RIGHT TO DUE PROCESS UNDER THE VERMONT CONSTITUTION**

177. The foregoing paragraphs are incorporated by reference.

178. As a public employee and member of the BCFD, according to local ordinance, Plaintiff had a legitimate claim to continued employment by the BCFD.

179. Plaintiff's entitlement to continued employment gave rise to a property interest within the meaning of Chapter 1, Article 10 of the Vermont Constitution.

180. Plaintiff was afforded no process at the time of her termination.

181. Plaintiff's termination was in violation of her due process rights under the Vermont Constitution.

182. As a result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

183. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.

## COUNT ELEVEN: RETALIATION IN VIOLATION OF VERMONT'S OCCUPATIONAL SAFETY AND HEALTH ACT

184. The foregoing paragraphs are incorporated by reference.

185. Defendants had a duty to furnish a place of employment free from recognized harm and to comply with safety and health standards.

186. Plaintiff expressed concerns relating to the fitness of an emergency response worker that implicated the Defendants' duty to protect its employees from hazardous workplace conditions.

187. Plaintiff was terminated as a direct result of asserting a concern of workplace safety.

188. Plaintiff's termination was retaliation for a complaint of workplace safety under Vermont's Occupational Safety and Health Act, 21 V.S.A. §101, *et seq.*

189. As a result of Defendants' violation of the Act, Plaintiff is entitled by statute to reinstatement, triple wages, other damages, and attorney's fees.

## COUNT TWELVE:                    INFLICTION OF EMOTIONAL DISTRESS

190. The foregoing paragraphs are incorporated by reference.

191. Defendants' conduct was intended to cause and did in fact cause Plaintiff to suffer severe emotional distress.

192. As a result of Defendants' infliction of emotional distress, Plaintiff has suffered and continues to suffer severe and lasting losses for which she is entitled to recover damages.

193. Defendants' conduct was wanton, willful and outrageous, and was undertaken with actual malice and/or a reckless disregard for plaintiffs' rights, such that an award of punitive damages is warranted.

**COUNT THIRTEEN:       UNLAWFUL CONSPIRACY**

194. The foregoing paragraphs are incorporated by reference.

195. One or more of the Defendants conspired with others, including but not limited to other Defendants, to deprive Plaintiff of the equal protection of the laws and/or of equal privileges and immunities under the laws.

196. The Defendants' actions alleged herein were taken in furtherance of the conspiracy.

197. As a result of the Defendants' conspiracy and the actions taken in furtherance thereof, Plaintiff has been injured in her person or property and/or deprived of having and exercising her rights and privileges as a citizen of the United States, for which she is entitled to recover damages against the Defendant conspirators pursuant to 42 U.S.C. §1985 to enforce her constitutional right to procedural due process of the laws.

**COUNT FOURTEEN:   VIOLATION OF VERMONT FAIR EMPLOYMENT PRACTICES ACT, 21 V.S.A. § 495**

198. The foregoing paragraphs are incorporated by reference.

199. Defendants discriminated against Plaintiff because of her gender, in violation of Vermont's Fair Employment Practices Act, 21 VSA § 495.

200. Defendant failed to ensure a workplace free of sexual harassment, in violation of Vermont's Fair Employment Practices Act, 21 VSA § 495h.

201. As a direct result of Defendants' violations of Vermont's Fair Employment Practices Act, Plaintiff has sustained severe and permanent injuries and losses for which she is entitled to recover compensatory and punitive damages or equitable relief, including restraint of prohibited acts, restitution of wages and other benefits, reinstatement, costs, reasonable attorney's fees and other appropriate relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in her favor, and seeks:

a.      reinstatement, including the same compensation, employment benefits, seniority, and same or equivalent position, shift schedule, and hours worked as the Plaintiff had  before the defendant's retaliatory action;

b.      payment of back pay, lost wages, benefits, and other remuneration;

c.      any appropriate preliminary, temporary and/or permanent injunctive relief, including without limitation an order that defendant cease and desist from any further acts of retaliation; and

d.      compensatory damages;

e.      punitive damages;

f.      costs of suit and attorney fees;

g.      interest; and

g.      any and all other appropriate relief.


DATED at Springfield, Vermont this ___16th___ day of December, 2011

                              **ELLIS BOXER & BLAKE**
                              **Attorneys for Plaintiff**


                    By: _____
                              Stephen D. Ellis
                              Jennifer K. Moore
                              24 Summer Hill Street
                              P.O. Box 948
                              Springfield, Vermont 05156
                              Phone:  802-885-2141
                              Fax:      802-885-2131
                              sdellis@ellisboxer.com
                              jkmoore@ellisboxer.com