**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

RACHEL WYATT,                                  :
                                               :
            Plaintiff,                         :
                                               :
       v.                                      :    Case No. 2:11-CV-00297
                                               :
CITY OF BARRE/BARRE CITY FIRE,                 :
DEPARTMENT, TIMOTHY BOMBARDIER,                :
JOE ALDSWORTH, ROBERT                          :
HOWARTH and CINDY HOWARTH,                     :
                                               :
            Defendants.                        :

**MEMORANDUM OPINION and ORDER**

Rachael Wyatt filed suit against the Barre City Fire

Department ("BCFD"); the City of Barre; Timothy Bombardier,

Chief of the BCFD; Robert Howarth and Joe Aldsworth, supervisors

at the BCFD; and Cindy Howarth, a coworker at the BCFD.  Wyatt

claims fourteen different causes of action arising out of

alleged sexual harassment and gender discrimination by the BCFD

and its employees.  Aldsworth has moved to dismiss all but two

of the fourteen claims, for failing to state a claim against

him.

For the reasons that follow, Aldsworth's motion to dismiss

is GRANTED with respect to Counts Two, Three, Six, Seven, Eight,

Nine and Ten, and DENIED with respect to Counts Five, Eleven,

Twelve, Thirteen, and Fourteen.

**FACTUAL BACKGROUND**

The following facts were gleaned from the complaint, and are assumed to be true for the purposes of this motion. Wyatt was a female member of the BCFD's Call Force from March, 2009 to September, 2010. Timothy Bombardier was the Chief during all times relevant to this suit. Joe Aldsworth was a fellow firefighter who was promoted to Deputy Chief at some point during Wyatt's time with the BCFD, though it is unclear exactly when that promotion happened.

From the early days of her employment with BCFD, Wyatt was subjected to harassment by fellow firefighters Robert and Cindy Howarth, and the harassment was motivated by Wyatt's gender. Wyatt frequently complained about the harassment both to Chief Bombardier and Aldsworth, who served as her mentor. Wyatt met with Aldsworth and Bombardier, and Bombardier indicated that he would employ mediators to try to resolve the problem. A mediator made one brief visit to the station, but the harassment continued nonetheless.

In February of 2010, Bombardier suspended Wyatt because she had yet to obtain an "EMT-B" (Emergency Medical Technician) certification. When Wyatt began work with the BCFD, she had completed an EMT training course, but had not passed the written examination required for "EMT-B" certification. BCFD policy required Wyatt to obtain her EMT-B certification or a

2

"Firefighter-1" certification within eighteen months of her date
of hire.  At the time she was suspended, however, Wyatt had
seven months remaining on that eighteen month period.  Moreover,
at the time of Wyatt's suspension there were other firefighters
without EMT-B certifications who were not suspended pending
certification.

Aldsworth volunteered to help Wyatt prepare for the written
examination.  However, "[w]hile doing so . . . he began to make
unwelcome comments of a sexual and suggestive nature."  Compl. ¶
72.  These "sexual advances were not welcome and were not
encouraged," and "after [Wyatt] repeatedly rebuked . . .
Aldsworth's sexual advances, Aldsworth 'suggested' that
Plaintiff consider looking for a job in another Department."
Compl. ¶¶ 74, 76.  Wyatt reported Aldsworth's harassment to
Bombardier in May of 2010, but Aldsworth was not reprimanded,
despite his admission to sending sexually charged messages.
After this report against Aldsworth, Bombardier lifted Wyatt's
suspension, but Aldsworth then informed her that "she still
would not be able to respond to emergency calls (or earn any
income) until she first completed forty hours of field
training."  Compl. ¶ 80.

After Wyatt completed the field training, "Aldsworth told
her she would remain on restricted duty until she completed an
Emergency Vehicle Operator training, despite that she had

already been trained and frequently drove those vehicles as part of her regular duty." Compl. ¶ 82. Similarly situated male coworkers were not subjected to the same restriction. Additionally, Aldsworth prohibited Wyatt from participating in "Rosie's Girl's," a community service program designed to encourage young girls to become firefighters. Wyatt alleges that "Aldsworth subjected [her] to these adverse employment actions because [she] refused his sexual advances and in retaliation for her reporting his sexual harassment." Compl. ¶ 87.

The situation came to a head in July and August of 2010. In July, 2010, Wyatt "made an anonymous [telephone] call to the State's Emergency Medical Services expressing concern about an EMT-I colleague's fitness for duty." Compl. ¶ 93. While not clear from the Complaint, memoranda filed by both parties indicate that Wyatt did not speak to anyone when she made this call, but left a recorded voice message. "For reasons not completely understood, the fact of the call was made known to Chief Bombardier. On August 31, 2010, [Wyatt] was summoned to Chief Bombardier's office, who asked whether she had made the call." Compl. ¶ 95. Aldsworth was also present in the office at that time. In an effort to protect her anonymity, Wyatt denied making the call. As a result, she was again suspended, pending investigation. Bombardier then obtained a copy of the

4

recorded call, and invited four other firefighters (including
Aldsworth) to listen to the recording for the purpose of
identifying Wyatt's voice. Then, "[h]aving satisfied himself
that [Wyatt] was the anonymous caller, Chief Bombardier . . .
fired [her] for 'lying.'" Compl. ¶ 98.  Wyatt alleges that
"[t]he stated reason for [her] termination was a pretext," and
that she "was terminated in retaliation for opposing and
reporting sexual harassment in the workplace." Compl. ¶ 99.

**DISCUSSION**

**I. Standard of Review**

The standard for reviewing a motion to dismiss pursuant to
Rule 12(b)(6) is well-known.  Citing *Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544 (2007) and Fed. Rule Civ. Proc. 8(a)(2),
the Supreme Court has explained:

> First, the tenet that a court must accept as true all
> of the allegations contained in a complaint is
> inapplicable to legal conclusions. Threadbare recitals
> of the elements of a cause of action, supported by
> mere conclusory statements, do not suffice . . .
> Second, only a complaint that states a plausible claim
> for relief survives a motion to dismiss.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (internal
quotation marks and citations omitted).

**II. Count Two: Breach of Contract**

Aldsworth argues that Wyatt has failed to plead facts
sufficient to state a claim against him for breach of contract.
Wyatt "agrees that she has not alleged a breach of contract

action against either the Defendant Allsworth or any other individual Defendant.  Accordingly, Aldsworth's motion to dismiss Count Two is GRANTED.

## III. Count Three: Wrongful Discharge in Violation of Public Policy

Aldsworth argues that Wyatt's wrongful discharge claim against him should be dismissed because such claims "can only be asserted against one's employer," and not against fellow employees.  (Def.'s Mem. at 4.) (citing *United States ex rel. Harris v. EPS, Inc*., No. 2:05-CV-212, 2006 WL 1348173 (D. Vt. May 16, 2006).  In *Harris*, the plaintiff sued his former employer, EPS, Inc., for wrongful discharge in violation of public policy.  Harris also sued the owner and manager of EPS in their individual capacities. This Court dismissed the claims against the owner and manager "[b]ecause Vermont case law provides no support for Harris's contention that he may bring an action for discharge in violation of public policy against [the owner and manager] in their individual capacities." *Harris*, 2006 WL 1348173 at *9.

Wyatt argues that *Harris* is no longer good law, citing the Vermont Supreme Court's decision in *Payne v. U.S. Airways*, 2009 VT 90, 987 A.2d 944 (2009).  *Payne*, however, did not involve a claim for wrongful termination in violation of public policy. Rather, *Payne* considered whether supervisors and coworkers may

6

be sued in their individual capacity for acts of discrimination
and retaliation under the Vermont Fair Employment Practices Act
("VFEPA"). *Payne*, 2009 VT 90, ¶ 1, 987 A.2d at 946. The
Vermont Supreme Court held that they may. *Id*. The court's
decision in *Payne* was based on a lengthy analysis of statutory
construction and legislative intent. *See Payne*, 2009 VT 90, ¶¶
7-21, 987 A.2d at 947-53. The question here is whether *Payne*
changed the rule articulated in *Harris* that plaintiffs may not
bring common law claims for wrongful termination in violation of
public policy against individual supervisors and coworkers. It
did not.

The Vermont Supreme Court has adopted the following test to
assess claims of wrongful discharge in violation of public
policy:

> The employee must show that (1) the employer directed
> the employee to perform an illegal or unethical act as
> part of the employee's duties; (2) the action directed
> by the employer would violate a statute or clearly
> expressed public policy; (3) he or she was terminated
> as a result of refusing to perform the requested act
> in violation of public policy; and (4) the employer
> was aware or should have been aware that the
> employee's refusal was based upon the employee's
> reasonable belief that the act was illegal or in
> violation of the employee's professional ethical code.

*LoPresti v. Rutland Regional Health Servs., Inc.*, 865 A.2d 1102,
1112-13 (Vt. 2004) (citing *Rocky Mtn. Hosp. & Med. Serv. v.
Mariani,* 916 P.2d 519, 527 (Colo. 1996)) (internal quotation
marks omitted). And this Court has observed that the term

7

"employer," as understood in claims for wrongful discharge in violation of public policy, refers to "companies and other organizations" rather than to individuals. *See Harris*, 2006 WL 1348173 at *8.

There are several reasons why this common law definition of employer remains intact, notwithstanding the Vermont Supreme Court's ruling in *Payne*. First, unlike the VFEPA statute, the common law test for claims of wrongful discharge in violation of public policy refers simply to the "employer," and does not account for agents of the employer. Second, the language of *Payne* indicates that the court intended to leave the common law definition of "employer" intact. The *Payne* court reasoned that "the Legislature's use of the conjunctive 'and any agent' in the definition of 'employer' in the VFEPA signals that the Legislature intended that, *in addition to those traditionally categorized as employers*, agents of the employer can be held liable." *Payne*, 2009 VT 90, ¶ 9, 987 A.2d at 948 (emphasis added). This statement indicates that the definition of "employer" under the VFEPA is broader than under the common law, but in no way implies that the common law definition should itself be expanded. Third, the *Payne* court did not attempt to change the common law understanding of the word "employer"—its analysis was limited to the construction of the VFEPA and similar statutes. Accordingly, coworkers such as Aldsworth are

8

not held individually liable for wrongful discharge in violation
of public policy.  Aldsworth's motion to dismiss Count Three is
GRANTED.

**IV. Count Six:  Violation of the Electronic Communications Privacy Act ("ECPA")**

The ECPA penalizes any person who "intentionally
intercepts, endeavors to intercept, or procures any other person
to intercept or endeavor to intercept, any wire, oral, or
electronic communication."  18 U.S.C. § 2511(1)(a).
"'[I]ntercept' means the aural or other acquisition of the
contents of any wire, electronic, or oral communication through
the use of any electronic, mechanical, or other device."  18
U.S.C. § 2510(4).  Thus, the plain language of the statute makes
clear that it is intended to prohibit wiretapping and other
forms of electronic surveillance.  And while the Second Circuit
has not addressed the issue, "a number of other circuits . . .
have held that a replaying of tapes containing recorded phone
conversations does not amount to a[n] . . . interception in
violation of the Wiretap Act."  *Noel v. Hall*, 568 F.3d 743, 749
(9th Cir. 2009) (citing *United States v. Hammond,* 286 F.3d 189,
193 (4th Cir. 2002); *Reynolds v. Spears,* 93 F.3d 428, 432-33
(8th Cir. 1996); *United States v. Shields,* 675 F.2d 1152, 1156
(11th Cir. 1982); *United States v. Turk,* 526 F.2d 654, 658 (5th
Cir. 1976)).  This Court follows the Fourth, Fifth, Eighth,

Ninth, and Eleventh Circuits to hold that "[n]o new interception occurs when a person listens to . . . [a] communication that has already been captured or redirected."

Wyatt alleges only that Aldsworth listened to a recorded phone message.  She does not allege that Aldsworth "acquired" the recording "through the use of any electronic, mechanical, or other device."  In support of her argument that Aldsworth "intercepted" the recording when he listened to it, Wyatt cites the Second Circuit's holding that "the place where the contents of a wire communication are first to be heard and understood by human ears, other than those of the parties to the conversation, is the *situs* of an interception within the meaning of [18 U.S.C.] § 2510(4)."  *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992) (emphasis added).  This holding from *Rodriguez*, however, dealt with determining *where* an interception occurred, rather than *if* an interception occurred.  It is inapposite here.  When Aldsworth listened to the recording, that act did not constitute an "interception" under the ECPA.

Wyatt then argues, however, that "it is irrelevant that the subsequent replaying may or may not constitute 'new interceptions' because the latter replaying *does* constitute unlawful use and disclosure of the unlawfully intercepted communication."  Pl.'s Mem. 11.  Along with prohibiting certain interceptions of communications, the ECPA prohibits the "use" or

10

"disclosure" of unlawfully intercepted communications.   18
U.S.C. § 2511(c)-(d).   However, other Courts have determined
that "merely listening to tape recordings of illegally
intercepted phone calls does not constitute use within the
meaning of" the ECPA.   *Peavy v. Harman*, 37 F. Supp. 2d 495, 513
(N.D. Tex. 1999) (citing *Fields v. Atchison, Topeka, and Santa
Fe Railway Co.,* 985 F.Supp. 1308, 1314 (D. Kan. 1997); *Reynolds
v. Spears,* 857 F.Supp. 1341, 1345 n. 5 (W.D.Ark.1994), *aff'd,* 93
F.3d 428 (8th Cir.1996)).   Nor can it be said that listening to
a recording constitutes "disclosure" under any understanding of
the word.   Accordingly, this Court holds that listening to a
recording does not constitute "use" or "disclosure" within the
meaning of the ECPA.

Since Aldsworth merely listened to a recorded telephone
call, he did not impermissibly "intercept" the communication,
nor did he "use" or "disclose" the communication in violation of
the ECPA.   Thus, Wyatt has failed to state a claim against
Aldsworth under the ECPA, and Aldsworth's motion to dismiss
Count Six is GRANTED. [1]

---

[1] It should be noted that the above analysis rests on the assumption that
Wyatt's claim refers to an interception *in addition to* the original voicemail
recording she left with EMS, and a use or disclosure of that additional
interception.   To the extent that Count Six may rely on the original
voicemail, it is still dismissed.   "An intentional interception of a
telephone conversation is not actionable if a party to the conversation gives
prior consent to the interception." *George v. Carusone*, 849 F. Supp. 159,
164 (D. Conn. 1994).   Wyatt consented to the recording of her phone call by
leaving a voice message on a recording device.   Accordingly, that
interception was not unlawful, nor was any use or disclosure of the contents

**V. Count Seven: Violation of the Stored Communications Act ("SCA")**

The SCA penalizes anyone who "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). Wyatt alleges that "[o]ne or more of the Defendants intentionally accessed, without authorization, the facility through which [the EMS voicemail system] was provided and/or intentionally exceeded an authorization to access that facility, and thereby obtained access to plaintiff's anonymous phone call regarding the impaired EMT, in violation of the [SCA]." Compl. ¶ 157. Wyatt further alleges that "Chief Bombardier obtain[ed] a copy of the recorded call, and then invit[ed] four other male Firefighters (including Aldsworth) to listen to the recording, for the purpose of identifying Plaintiff's voice." Compl. ¶ 97.

The alleged facts are insufficient to state a claim. With respect to Aldsworth, Wyatt alleges merely that he listened to the tape recording. Nowhere in the Complaint does she allege that Aldsworth accessed the EMS voicemail system. Much as it

of that interception unlawful. *See* 18 U.S.C. §§ 2511(1)(c)-(d), 2511(2)(c)-(d).

does not constitute an "intercept" under the ECPA, the mere act
of listening to a recording does not constitute "accessing a
facility through which an electronic communication service is
provided."

Conceivably, Aldsworth may be included in Wyatt's
allegation that "[o]ne or more of the Defendants intentionally
accessed, without authorization, the facility through which [the
EMS voicemail system] was provided." Compl. ¶ 157.  However, in
light of her earlier allegation that it was Chief Bombardier who
obtained the recording, the latter, more general allegation does
not allow the inference that it was Aldsworth who accessed the
voicemail system to obtain the recording.  Wyatt's "threadbare
recital of the elements" is insufficient to state a claim.
*Iqbal*, 556 U.S. at 678-79.  Because Wyatt has failed to allege
any facts to "permit the [C]ourt to infer more than the mere
possibility of misconduct," Aldsworth's motion to dismiss Count
Seven is GRANTED.

## VI. Count Eight: Invasion of Privacy

"'Invasion of privacy' is a term applied to several
distinct types of harm." *Staruski v. Cont'l Tel. Co. of Vt.*,
581 A.2d 266, 268 (Vt. 1990).  In her response to the present
motion, Wyatt asserts that her claim is of the "intrusion upon
seclusion" type described in *Hodgdon v. Mt. Mansfield Co.*, 624
A.2d 1122, 1129 (Vt. 1992).  "To state a cause of action for

intrusion upon seclusion, the plaintiff must allege 'an intentional interference with her interest in solitude or seclusion, either as to her person or as to her private affairs or concerns, of a kind that would be highly offensive to a reasonable person.'  Moreover, the intrusion must be substantial." *Hodgdon*, 624 A.2d at 1129 (quoting Restatement (Second) of Torts § 652B (1977).

Wyatt alleges that "[t]he Defendants intentionally interfered with [her] right to privacy when they accessed the voicemail recording, and played the recording in the presence of Plaintiff's colleagues, including her harassers."  This allegation fails to state a claim against Aldsworth.  As described above, the only "Defendants" [sic] who Wyatt alleges "accessed" and "played" the voicemail recording is Bombardier.  Other than to make a blanket allegation against all Defendants, Wyatt does not allege that Aldsworth obtained or played the recording, nor does she allege that her privacy was invaded by the colleagues who merely *listened* to the recording.  Moreover, by leaving a recorded voice message, Wyatt waived any right to privacy with respect to that message.  *See Smith v. Maryland*, 442 U.S. 735 743-44 (1979) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.").  Because the Complaint fails to allege that Aldsworth committed the act underlying the alleged tort—

accessing and playing the recording—and because Wyatt waived any expectation of privacy in the message, Aldsworth's motion to dismiss Count Eight is GRANTED.

## VII. Counts Nine and Ten: Deprivation of Property Interest in Violation of Due Process

The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Similarly, Article 10 of the Vermont Constitution provides that no person "can . . . be justly deprived of liberty, except by the laws of the land." Vt. Const. ch. I, art. 10. Article 10 also protects property interests. *See e.g., In re Smith*, 730 A.2d 605, 612 (Vt. 2001) (recognizing a nurse's "interest in maintaining her [professional] license, and thus her livelihood," and observing that "[t]he due process requirements imposed by Article 10 of the Vermont Constitution mirror those imposed by the United States Constitution."). Here, Wyatt alleges that she was deprived of a property interest in her job with BFD.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)). And as Wyatt points out, it is also well settled that

"[t]he personal involvement of a supervisory defendant may be shown by evidence that . . . the defendant participated directly in the alleged constitutional violation." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).  Wyatt argues that "Aldsworth participated directly in the circumstances giving rise to [Wyatt's] firing, including his role as harasser, retaliator, and co-conspirator in the invasion of Plaintiff's privacy to further the employer's efforts in pursuing a pretextual discharge."  Pl.'s Mem. 9.

However, the alleged constitutional violation here is termination of employment without due process.  Wyatt must allege that Aldsworth participated directly in that deprivation. It is not enough to allege that he participated directly "in the circumstances giving rise" to the situation in which the alleged deprivation occurred.  This Court has repeatedly held that city employees who are not directly responsible for termination procedures afforded subordinates may not be held liable for the fired employee's alleged deprivation of due process.  *See Bearss v. Wilton*, Civil Action No. 2:08-CV-248, slip op. at 29 (D. Vt. Aug. 10, 2010); *Martin v. Town of Brattleboro*, No. 2:07-cv-260, 2008 WL 4416283, at *1 (D. Vt. Sep. 24, 2008) (Sessions, J.) ("accept[ing]" Report and Recommendation with respect to procedural due process issue).

16

The Complaint fails to allege that Aldsworth had any say or part in the procedures used to terminate Wyatt.  And under Vermont law, only the "chief engineer" may dismiss or suspend a fireman.  Vt. Stat. Ann. tit. 24, § 1954.  At the time of the firing, Bombardier was the Chief of the Barre City Fire Department, and Aldsworth was the Deputy Chief.  Complaint ¶¶ 5-6.  As Deputy Chief, Aldsworth did not have the authority to terminate Wyatt, or to establish the procedures used to terminte her.  Accordingly, he cannot be held liable for Wyatt's alleged deprivation of due process, and his motion to dismiss Counts Nine and Ten is GRANTED.

## VIII. Count Thirteen: Unlawful Conspiracy

"In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve [an] unlawful end."  *Webb v. Goord* 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted) (citing *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000); *Warburton v. Underwood,* 2 F.Supp.2d 306, 319 (W.D.N.Y. 1998).

Aldsworth argues that the conspiracy claim against him should be dismissed because it is barred by the "intraenterprise conspiracy doctrine."  The intraenterprise conspiracy doctrine holds that "there is no conspiracy if the conspiratorial conduct

17

challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978). However, "[a]n exception to the intra[enterprise] conspiracy doctrine exists when individuals pursue 'personal interests wholly separate and apart from the entity.'" *Orafan v. Goord*, 411 F. Supp. 2d 153, 165 (N.D.N.Y. 2006).

Wyatt has alleged that Aldsworth sexually propositioned her on a number of occasions. The Complaint does not specifically allege that these activities fell outside the scope of Aldsworth's employment. However, in at least one instance, the Vermont Supreme Court has held that sexual misconduct is outside the scope of employment as a matter of law. *Doe v. Forrest*, 853 A.2d 48, 55 (Vt. 2004) ("[C]oercing plaintiff to perform fellatio was [not] conduct that was actuated, even in part, by a purpose to serve the county sheriff . . . [A]n act rooted in prurient self-interest-cannot properly be seen as intending to advance the employer's interests.") Assuming Wyatt's allegations to be true, Aldsworth's sexual advances could not, as a matter of law, be said to be within the scope of his employment.

Aldsworth also argues that "the Complaint alleges no factual matters suggesting that [he] entered into an agreement

18

with anyone . . . to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." Def.'s Reply Mem. 9-10.  The Court disagrees.  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Wyatt has alleged that

> By the Summer of 2010, [she] had been compelled to endure a hostile work environment based upon her sex, had been subjected to *quid pro quo* sexual harassment, and had been retaliated against for reporting both. None of the perpetrators had been reprimanded; Chief Bombardier publicly doubted that Aldsworth's sexual advances were unwelcomed by Plaintiff; and, Plaintiff herself was suspended in humiliating and demeaning fashion and was then subjected to an ever-expanding list of arbitrary requirements that were not applied equally to male firefighters.

Compl. ¶ 91.  The Complaint outlines numerous specific facts which, when accepted as true, support these general allegations.

The extensive facts alleged in the Complaint, when considered in their entirety, support the plausible inference that there was a station-wide agreement (tacit or otherwise) to subject Wyatt to harassment, hostile working conditions, and adverse employment actions, and that Aldsworth was a party to that agreement.

Since Aldsworth acted outside the scope of his employment when he allegedly propositioned Wyatt, and since the facts

stated in the Complaint support the inference that Aldsworth, Bombardier, and others entered into an agreement to perpetrate and permit that harassment, Aldsworth's motion to dismiss the conspiracy claim is DENIED.

## IX. Immunity from State-Law Claims

Finally, Aldsworth asks that all state-law claims against him be dismissed pursuant to Vt. Stat. Ann. tit. 24, § 901(a). Section 901(a) provides that "[w]here an action is given [against] any appointed or elected municipal officer . . . it shall be brought against such town." Aldsworth argues that because he is a municipal officer, § 901(a) protects him from suit. Wyatt argues that while § 901(a) may protect Aldsworth from lawsuits arising out of his official duties, "§ 901 does not . . . immunize municipal officers for unlawful conduct, such as Aldsworth's acts of sexual harassment, committed outside the scope of their official duties." Pl.'s Mem. 19.

While it does not appear that the Vermont Supreme Court has directly addressed this issue, some Vermont trial courts have. One court found that several town officers were protected from suit under § 901(a) because the "allegations all concern[ed] [those] individuals acting in their official capacity" and "there [were] no allegations that would support a cause of action against [those] individuals in their individual capacities." *Livingston v. Town of Hartford*, Trial Order, No.

20

482-9-06 Wrcv, 2007 WL 7632577 (Vt. Super. May 17, 2007).  A
second court—pursuant to § 901(a)—refused to find individual
liability where "[t]here was no evidence offered that the
actions of [the] individuals exceeded the power or official
duties of their respective offices and therefore the court
concludes that there is no individual liability." *Hamilton v.
Dowland*, Trial Order, No. 200-8-01 Ossc., 2005 WL 5872172 (Vt.
Super. Nov. 30, 2005).  These results comport with logic.  It
would be unreasonable to impose liability on municipalities for
all misdeeds of their officers irrespective of whether the
misdeeds were committed in the course of an officer's execution
of his or her official role.

Counts Five, Eleven, Twelve and Fourteen are the state
claims that have yet to be dismissed.  Because § 901(a) does not
protect municipal officers from suits arising from acts
committed outside the scope of their official duties, and
because Aldsworth has failed to argue that the acts underlying
Counts Five, Eleven, Twelve and Fourteen fell within the scope
of his official duties—or that they should be dismissed for any
other reason, Aldsworth's motion to dismiss counts Five, Eleven,
Twelve, Thirteen and Fourteen is DENIED.

**CONCLUSION**

Aldsworth's motion to dismiss Counts Two, Three, Six, Seven, Eight, Nine and Ten is GRANTED.  His motion to dismiss Counts Five, Eleven, Twelve, Thirteen and Fourteen is DENIED.

Dated at Burlington, Vermont this 25th day of April, 2012.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge